**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| NATALIE HENDERSON, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| LCS FINANCIAL SERVICES CORPORATION, | |
| Defendant. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Natalie Henderson ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against LCS Financial Services Corporation ("LCS" or "Defendant"), by and through her attorneys, and alleges, based upon personal knowledge as to her own actions, and based upon information and belief as to all other matters, as follows.

## I.    INTRODUCTION

1.    LCS is a collections agency that primarily focuses on debt recovery services on behalf of financial institutions across the Untied States, including credit unions and lenders.[1]

2.    As a collections agency, LCS collects, maintains, and stores highly sensitive personal pertaining to its customers' clients, including, but not limited to: full names, addresses, Social Security numbers, email addresses, and dates of birth ("Private Information").

3.    Although LCS is a sophisticated debt collection company, it failed to invest in adequate data security, and as a direct, proximate, and foreseeable result of LCS's failure to implement reasonable security protections sufficient to prevent an eminently avoidable

---

[1] *Home*, LCS Financial Services Corporation, https://lcsfin.com/ (last visited Oct. 11, 2023).

cyberattack, unauthorized actors compromised LCS's network and accessed files containing highly-sensitive PII.[2]

4.      Specifically, on or about February 25, 2023, LCS detected unusual activity on its computer systems.[3] LCS action to secure its systems, and reported the data breach to the FBI.[4]

5.      LCS then initiated an investigation into the data breach, which later determined that the unauthorized actors first gained access to LCS's system on February 24, 2023, and that the unauthorized actors were able to access consumer information.[5] LCS asserts that the investigation into the data security incident was completed on August 23, 2023.[6]

6.      On September 22, 2023, LCS began issuing written notice to individuals whose Private Information was exposed in the data breach.[7]

7.      LCS failure secure consumers' Private Informing, and its failure to promptly notify Plaintiff and Class members that their PII was exfiltrated due to LCS's security failures virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse and/or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

---

[2] *See, e.g.*, https://beyondmachines.net/event_details/lcs-financial-services-debt-collectors-report-data-breach-n-7-g-3-s (last visited Oct. 11, 2023).
[3] *Id.*
[4] *Id.*
[5] *See Notice of Data Breach,* available athttps://oag.ca.gov/system/files/LCS%20Financial%20-%20Regulatory%20Notification%20-%20CA_0.pdf (Sept. 22, 2023).
[6] *Id.*
[7] *See, e.g.*, https://beyondmachines.net/event_details/lcs-financial-services-debt-collectors-report-data-breach-n-7-g-3-s (last visited Oct. 11, 2023

8.      LCS failed to take sufficient and reasonable measures to safeguard its data security systems and protect highly sensitive data in order to prevent the Data Breach from occurring; to disclose to its clients, to consumers, and to the public at large, that LCS lacked appropriate data systems and security practices to secure PII; and to timely detect and provide adequate notice of the Data Breach to affected individuals. Due to LCS failures, Plaintiff and tens of thousands of individuals suffered substantial harm and injury.

9.      As a result of LCS's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its self-imposed, statutory, and common-law obligations, Plaintiff's and Class members' PII was accessed and acquired by unauthorized third-parties for the express purpose of misusing the data and causing further irreparable harm to the personal, financial, reputational, and future well-being of consumers. Plaintiff and Class members face the real, immediate, and likely danger of identity theft and misuse of their PII, especially because their PII was specifically targeted by malevolent actors.

10.     Plaintiff and Class members suffered injuries as a result of LCS' conduct including, but not limited to: lost or diminished value of their PII; out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; time needed to change usernames and passwords on their accounts; time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their PII, which remains in LCS's possession and is subject

to further unauthorized disclosures so long as LCS fails to undertake appropriate and adequate measures to protect their PII. These risks will remain for the lifetimes of Plaintiff and the Class.

11.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief from LCS's failure to reasonably safeguard Plaintiff's and Class members' PII; its failure to reasonably provide timely notification that Plaintiff's and Class members' PII had been compromised by an unauthorized third party; and for intentionally and unconscionably deceiving Plaintiff and Class members concerning the status, safety, location, access, and protection of their PII.

## II.     PARTIES

### *Plaintiff Natalie Henderson*

12.     Plaintiff Natalie Henderson is a resident and citizen of Louisiana, residing in Olive Branch. Plaintiff Henderson received a data breach letter from Defendant dated September 22, 2023.

### *Defendant FCS Financial Services Corp.*

13.     Defendant LCS Financial Services Corp. is a Colorado Corporation with its principal place of business located at 6782 S. Potomac Street, Suite 100, Englewood, Colorado 80112.

## III.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

15.     This Court has personal jurisdiction over Defendant because Defendant is authorized to and regularly conducts business in Colorado, and is headquartered in Englewood, Colorado.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    LCS Financial Services – Background

17.     LCS is a "full service" debt recovery agency—a debt collector—that specializes in providing debt recovery services to financial institutions, credit unions, and other lenders.[8]

18.     As part of its business operations, LCS collects, maintains, and stores the highly sensitive consumer PII provided by LCS's current and former clients, including but not limited to: full names, Social Security numbers, account number(s), email addresses, mailing address and dates of birth.

19.     On information and belief, at the time of the Data Breach, LCS had failed to implement necessary data security safeguards, which resulted in unauthorized third parties accessing the PII of tens of thousands of consumers.[9]

20.     As a debt collection agency, LCS has an ongoing duties and obligations to consumers, such as Plaintiff and Class members, to comply with its obligations to keep consumers' sensitive and personal information, including Private Information, confidential and secure from

---

[8] *Home*, LCS Financial Services Corporation, https://lcsfin.com/ (last visited Oct. 11, 2023).
[9] https://beyondmachines.net/event_details/lcs-financial-services-debt-collectors-report-data-breach-n-7-g-3-s (last visited Oct. 11, 2023).

illegal and unauthorized access, and LCS will provide consumers with prompt and accurate notice of any unauthorized access to their Private Information.

21.    Unfortunately for Plaintiff and Class members, LCS failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security, thus failing to protect Plaintiff and Class members from having their Private Information exfiltrated during the Data Breach.

**B.    The Data Breach**

22.    LCS disclosed in a Notice sent to affected consumers on or about September 22, 2023, that on February 23, 2023, it has discovered that a cyber-intruder accessed information contained on LCS's systems.  LCS subsequently initiated an investigation into the breach, and it ultimately confirmed that the cyber-intruder accessed and exfiltrated consumers' Private Information.[10]

23.    Despite learning as early as February 23, 2023, that unauthorized actors had accessed its computer systems, and confirming that the unauthorized actors accessed and exfiltrated consumers' Private Information, LCS delayed sending individualized notice to affected patients until approximately September 22, 2023—**seventh months** after discovery of the Data Breach—during which time malevolent actors had unfettered access to this highly valuable information unbeknownst to Plaintiffs and the Class.

**C.    LCS's Many Failures Both Prior to and Following the Breach**

24.    LCS could have prevented this Data Breach by properly encrypting or otherwise protecting their equipment and network files containing Private Information.

---

[10] https://beyondmachines.net/event_details/lcs-financial-services-debt-collectors-report-data-breach-n-7-g-3-s (last visited Oct. 11, 2023).

25.     To be sure, collecting, maintaining, and protecting Private Information is vital to virtually every aspect of LCS operations as debt collection agency. Yet, LCS failed protect consumers' Private Information, and failed to ackonlwedge publicly that it has suffered a data security incident that affected consumers for seven months.[11]

26.     When Private Information finally acknowledged that it had experienced a breach, it failed to fully inform affected individuals of the full extent of the data breach, and the Pivate Information that was accessed during the Data Breach. LCS did, however, acknowledge that in response to the cyber-attack it "implemented several measures to enhance [its] security posture and reduce the risk of similar future incents,"[12] impliedly admitting that its information systems policies and protocols were inadequate prior to the incident.

27.     LCS's failure to properly safeguard Plaintiff's and Class members' Private Information allowed the unauthorized actors to access this highly valuable information, but LCS's failure to timely notify Plaintiff and other victims of the Data Breach that their Private Information had been misappropriated served only to exacerbate the harms they suffered as a direct and proximate result thereof, because it precluded them from taking meaningful steps to safeguard their identities prior to the further dissemination and misuse of their Private Information.

28.     LCS failed to timely notify affected individuals, including Plaintiff and Class members, that their highly-sensitive Private Information had been accessed by unauthorized third parties. LCS waited approximately seven months to notify victims of the Data Breach that their Private Information had been compromised.

---

[11] *Notice of Data Security Incident*, https://oag.ca.gov/system/files/LCS%20Financial%20-%20Regulatory%20Notification%20-%20CA_0.pdf.

[12] *Id.*

29.     LCS has made no effort to protect Plaintiff and the Class from the long-term consequences of LCS's acts and omissions. Although the notice offered victims a complimentary one-year membership to credit monitoring services, Plaintiff's and Class members' Private Information, including their Social Security numbers, cannot be changed and will remain at risk long beyond one year. As a result, Plaintiff and the Class will remain at a heightened and unreasonable risk of identity theft for the remainder of their lives.

30.     In short, LCS's myriad failures, including the failure to timely detect the Data Breach and/or notify Plaintiff and Class members that their Private Information had been exfiltrated due to LCS's security failures, allowed unauthorized individuals to access, misappropriate and misuse Plaintiff's and Class members' Private Information for months before LCS finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D.     Data Breaches Pose Significant Threats**

31.     Data breaches have become a constant threat that, and Private Information, including Social Security numbers in particular, are a particularly valuable commodity and a frequent target of hackers.

32.     In fact, Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, estimates that the annual number of data breaches occurring in the United States increased by approximately 692% between 2005 and 2018, a year during which over 446.5 million personal records were exposed due to data breach incidents.[13]   Conditions have only worsened since: Statista estimates that "[i]n 2019, the number

---

[13] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2020*, Statista, https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-unitedstates-by-number-of-breaches-and-records-exposed (last accessed last accessed March 11, 2023).

of data breaches in the United States amounted to 1,473 with over 164.68 million sensitive records exposed[,]" and that "[i]n the first half of 2020, there were 540 reported data breaches."[14]

33.    Data breaches are a constant threat because of the price that Private Information is sold for on the dark web. For the individual, identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

34.    Individuals are particularly concerned with protecting the privacy of their financial account information and social security numbers. Neal O'Farrell, a security and identity theft expert for Credit Sesame, calls a Social Security number "your secret sauce," that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."

35.    In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and patient information.

36.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

---

[14] *Id.*

37.     Further, consumers' Private Information remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[16]

38.     Social Security numbers are among the most dangerous kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

---

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed March 11, 2023).
[16] *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed March 11, 2023).
[17] Social Security Administration, *Identity Theft and Your Social Security Number*, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed March 11, 2023).

39.     Furthermore, trying to change or cancel a stolen Social Security number is no minor task. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

41.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[19]

42.     Given the nature of LCS's Data Breach, as well as the length of the time LCS's networks were breached and the long delay in notification to the Class, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class members' Private Information can easily obtain Plaintiff's and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

---

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), available at http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed March 11, 2023).
[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), available at http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed March 11, 2023).

43.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[20] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

44.    To date, LCS has offered its consumers only one year of identity theft monitoring services. The offered services are inadequate to protect Plaintiff and the Class from the threats they will face for years to come, particularly in light of the Private Information at issue here.

45.    Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep Private Information private and secure, LCS failed to take appropriate steps to protect the Private Information of Plaintiff and the Class from misappropriation. As a result, the injuries to Plaintiff and the Class were directly and proximately caused by LCS's failure to implement or maintain adequate data security measures for consumers' Private Information.

**E.    LCS Had a Duty and Obligation to Protect PII**

46.    LCS has an obligation, both statutory and self-imposed, to keep confidential and protect from unauthorized access and/or disclosure Plaintiff's and Class members' Private Information. LCS's obligations are derived from: 1) government regulations and state laws, including state and FTC rules and regulations; 2) industry standards; and 3) promises and representations regarding the handling of sensitive Private Information. LCS obtained consumers'

---

[20] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed March 11, 2023).

Private Information, including Private Information concerning Plaintiff and Class members, and on the understanding and promise that consumers' Private Information would be protected and safeguarded from unauthorized access or disclosure.

47.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

48.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[21] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a

---

[21] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed September 15, 2023).
[22] *Id.*

breach.[23] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

49.    The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-marking.[24]

50.    Here, at all relevant times, LCS was fully aware of its obligation to protect Private Information, including Plaintiff's and Class members' Private Information. LCS is a sophisticated and technologically savvy debt collection agency that relies extensively on technology systems and networks to maintain its practice, including transmitting its consumers' Private Information in order to operate its business.

51.    LCS had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between LCS and Plaintiff and Class members. LCS alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

52.    LCS's failure to follow the FTC guidelines and its subsequent failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data constitutes unfair acts or practices prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 14 U.S.C. § 45.

53.    Further, LCS had a duty to promptly notify Plaintiff and the Class that their PII was accessed by unauthorized persons.

---

[23] *Id.*
[24] *Start With Security*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

**F.    LCS Violated FTC and Industry Standard Data Protection Protocols**

54.    As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

55.    Some industry best practices that should be implemented by businesses dealing with sensitive PHI like Defendant include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

56.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

57.    AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

58.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

59.     The FTC rules, regulations, and guidelines obligate businesses to protect Private Information, from unauthorized access or disclosure by unauthorized persons.

60.     At all relevant times, LCS was fully aware of its obligation to protect consumers' Private Information that it obtained from its customers, because it is a sophisticated business entity that is in the business of maintaining and transmitting Private Information.

61.     LCS was also aware of the significant consequences of its failure to protect Private Information for the tens of thousands of consumers whose Private Information was provided to LCS, and knew that this data, if hacked, would injure consumers, including Plaintiff and Class members.

62.     Unfortunately, LCS failed to comply with state and FTC rules, regulations and guidelines, and industry standards concerning the protection and security of Private Information. As evidenced by the duration, scope, and nature of the Data Breach, among its many deficient practices, LCS failed in, *inter alia*, the following respects:

     a.     Developing and employing adequate intrusion detection systems;

     b.     Engaging in regular reviews of audit logs and authentication records;

     c.     Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

     d.     Ensuring the confidentiality and integrity of consumers' Private Information that Defendant receives and maintains;

     e.     Protecting against any reasonably anticipated threats or hazards to the security or integrity of its consumers' Private Information;

     f.     Implementing policies and procedures to prevent, detect, contain, and correct security violations;

     g.     Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

h.    Implementing technical policies, procedures and safeguards for electronically stored information concerning Private Information that permit access for only those persons or programs that have specifically been granted access; and

i.    Other similar measures to protect the security and confidentiality of consumers' Private Information.

63.    Had LCS implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. LCS could have prevented or detected the Data Breach prior to the hackers accessing LCS's systems and extracting sensitive and personal information; the amount and/or types of Private Information accessed by the hackers could have been avoided or greatly reduced; and consumers would have been notified sooner, allowing them to promptly take protective and mitigating actions.

## G.   LCS's Data Security Practices are Inadequate and Inconsistent with its Self-Imposed Data Security Obligations

64.    LCS purports to care about data security and safeguarding consumers' Private Information, and represents that it will keep secure and confidential the Private Information.[25]

65.    Plaintiff's and Class members' Private Information was provided to LCS in reliance on its promises and self-imposed obligations to keep Private Information confidential, and to secure the Private Information from unauthorized access by malevolent actors. It failed to do so.

66.    Had LCS undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as LCS would have detected the Data Breach prior to the hackers extracting data from LCS's networks, and consumers would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

---

[25] Privacy Policy, *LCS Financial Services*, https://lcsfin.com/privacy/ (last visited Oct. 11, 2023).

67.    Indeed, following the Data Breach, LCS effectively conceded that its security practices were inadequate and ineffective. In the Notice it sent to Plaintiff and others, Defendant acknowledged that the Data Breach required it to "implement new technical safeguards."[26]

## H.    Plaintiff and the Class Suffered Harm Resulting from the Data Breach

68.    Like any data hack, the Data Breach presents major problems for all affected. According to Jonathan Bowers, a fraud and data specialist at fraud prevention provider Trustev, "Give a fraudster your comprehensive personal information, they can steal your identity and take out lines of credit that destroy your finances for years to come."[27]

69.    The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[28]

70.    The ramifications of LCS's failure to properly secure the PII of Plaintiff and Class members, are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

71.    According to data security experts, one out of every four data breach notification recipients becomes a victim of identity fraud.

---

[26] Data Breach Notice, https://oag.ca.gov/system/files/LCS%20Financial%20-%20Regulatory%20Notification%20-%20CA_0.pdf (last visited Oct. 11, 2023).
[27] Roger Cheng, *Data Breach Hits Roughly 15M T-Mobile Customers, Applicants*, CNET (Oct. 1, 2015), available at: http://www.cnet.com/news/data-breach-snags-data-from-15m-t-mobile-customers/. (last accessed March 11, 2023).
[28] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed March 11, 2023).

72.     Furthermore, Private Information has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

73.     Accordingly, LCS's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[29] Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[30] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[31] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' PII will do so at a later date or re-sell it.

74.     In response to the Data Breach, LCS offered to provide certain individuals whose Private Information was exposed in the Data Breach with one year of credit monitoring. However, one year of complimentary credit monitoring is a period much shorter than what is necessary to protect against the lifelong risk of harm imposed on Plaintiff and Class members by LCS's failures.

---

[29] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), available at http://www.iii.org/insuranceindustryblog/?p=267 (last accessed March 11, 2023).

[30] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), available at http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last accessed March 11, 2023).

[31] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, available at https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed March 11, 2023).

75.    Moreover, the credit monitoring offered by LCS is inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive Private Information.

76.    Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a.    Theft of Private Information;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.    Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.    Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite LCS's delay in disseminating notice in accordance with state law;

e.    The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.    The loss of Plaintiff's and Class members' privacy.

77.    Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within a mere one year: the unauthorized access of Plaintiff's and Class members' Private Information, especially their Social Security numbers, puts Plaintiff and the Class at risk of identity theft indefinitely, and well beyond

the limited period of credit monitoring that LCS offered victims of the Breach. The one year of credit monitoring that LCS offered to certain victims of the Data Breach is inadequate to mitigate the aforementioned injuries Plaintiff and Class members have suffered and will continue to suffer as a result of the Data Breach.

78.     As a direct and proximate result of LCS's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft.

79.     Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both herself and similarly situated individuals whose Private Information was accessed in the Data Breach.

80.     LCS is aware of the ongoing harm that the Data Breach has and will continue to impose on consumers, as the notices that it posted and sent to Plaintiff and Class members regarding the Data Breach advise the victims to "remain vigilant by reviewing your account statements and credit reports closely."[32]

## I.     Plaintiff Henderson's Experience

81.     In October 2023, Plaintiff Henderson received a notice from Defendant that her Private Information had been improperly accessed and/or obtained by third parties.

82.     Plaintiff Henderson experienced a massive uptick in the number of spam calls and emails which started in February or March 2023 and continues to present day. Given the timeline of the breach, Plaintiff Henderson believes that this dramatic uptick in spam is the result of the Data Breach.

---

[32] *See Data Breach Notification*, https://oag.ca.gov/system/files/LCS%20Financial%20-%20Regulatory%20Notification%20-%20CA_0.pdf (last visited Oct. 11, 2023).

83.     Additionally, subsequent to the Data Breach, Plaintiff Henderson experienced multiple unauthorized inquires on her credit. Based on the timing of the unauthorized attempts to access her credit reports, Plaintiff Henderson believes that the fraudulent activity is the result of the Data Breach.

84.     After learning of the Breach, Plaintiff Henderson has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Henderson has spent several hours dealing with the Data Breach, valuable time Plaintiff Henderson otherwise would have spent on other activities, including, but not limited to, work and/or recreation.

85.     As a result of the Data Breach, Plaintiff Henderson has suffered anxiety due to the public dissemination of her Private Inforamtion, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud.  Plaintiff Henerson is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

86.     Plaintiff Henderson suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Henderson; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

87.     As a result of the Data Breach, Plaintiff Henderson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by

the Data Breach. As a result of the Data Breach, Plaintiff Henderson is at a present risk and will

continue to be at increased risk of identity theft and fraud for years to come.

<strong>V.     CLASS ALLEGATIONS</strong>

88.     Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P.

23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose PII was accessed in the Data
> Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to

this case. Plaintiff reserves the right to modify, change or expand the Class definition after

conducting discovery.

89.     In the alternative, Plaintiff brings this action on behalf of herself and, pursuant to

Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons who are residents of the State of Louisiana whose PII was
> accessed in the Data Breach (the "Louisiana Subclass").

Excluded from the Louisiana Subclass are Defendant, its executives and officers, and the Judge(s)

assigned to this case.

90.     Numerosity: Upon information and belief, the Class is so numerous that joinder of

all members is impracticable. While the exact number and identities of individual members of the

Class are unknown at this time, such information being in the sole possession of Defendant and

obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis

alleges, that approximately tens of thousands of individuals comprise the Class and were affected

by the Data Breach. The members of the Class will be identifiable through information and records

in LCS's possession, custody, and control.

91.     Existence and Predominance of Common Questions of Fact and Law: Common

questions of law and fact exist as to all members of the Class. These questions predominate over

the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.    Whether Defendant's data security and retention policies were unreasonable;

    b.    Whether Defendant failed to protect the confidential and highly sensitive information with which it was entrusted;

    c.    Whether Defendant owed a duty to Plaintiff and Class members to safeguard their Private Information;

    d.    Whether Defendant Defendant any legal duties in connection with the Data Breach;

    e.    Whether Defendant conduct was intentional, reckless, willful or negligent;

    f.    Whether Plaintiff and Class members suffered damages as a result of LCS's conduct; and

    g.    Whether Plaintiff and the Class are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

92.    <u>Typicality</u>: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff and the members of the Class sustained damages as a result of LCS's uniform wrongful conduct.

93.    <u>Adequacy</u>: Plaintiff is an adequate representative because her interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are antagonistic to the interests of other members of the Class.

94.    <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each

individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by LCS's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, LCS's records and databases.

95.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I — Negligence
**(By Plaintiff on behalf of the Class, or, in the alternative, the Louisiana Subclass)**

96.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

97.    This count is brought on behalf of all Class members.

98.    Defendant owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining, retaining, and securing the Private Information that Defendant collected.

99.    Defendant owed a duty to Plaintiff and the Class to provide security, consistent with industry standards and requirements, and to ensure that its cyber networks and systems, and the personnel responsible for them, adequately protected the Private Information that Defendant collected.

100.    Defendant owed a duty to Plaintiff and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of a data breach as soon as possible after it is discovered.

101.    Defendant owed a duty of care to Plaintiff and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

102.    Defendant solicited, gathered, and stored the Private Information belonging to Plaintiff and the Class.

103.    Defendant knew or should have known it inadequately safeguarded this information.

104.    Defendant knew that a breach of its systems would inflict millions of dollars of damages upon Plaintiff and Class members, and Defendant was therefore charged with a duty to adequately protect this critically sensitive information.

105.    Defendant had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' highly sensitive Private Information was entrusted to Defendant on the understanding that adequate security precautions would be taken to protect the Private Information. Moreover, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

106.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff, Class members, and their Private Information. Defendant's misconduct included failing to: (1) secure its systems, servers and networks, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

107.    Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate cyber networks and data security practices to safeguard the Private Information belonging to Plaintiff and the Class.

108.    Defendant breached its duties to Plaintiff and the Class by creating a foreseeable risk of harm through the misconduct previously described.

109.    Defendant breached the duties it owed to Plaintiff and Class members by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of Private Information.

110.    The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the Private Information belonging to Plaintiff and the Class so that Plaintiff and the Class can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

111.    Defendant breached the duties it owed to Plaintiff and the Class by failing to timely and accurately disclose to Plaintiff and Class members that their Private Information had been improperly acquired or accessed.

112.    Defendant breached its duty to timely notify Plaintiff and Class members of the Data Breach by failing to provide direct notice to Plaintiff and the Class concerning the Data Breach until on or about September 22, 2023.

113.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered a drastically increased risk of identity theft, relative to both the time period before the breach, as well as to the risk born by the general public, as well as other damages, including but not limited to time and expenses incurred in mitigating the effects of the Data Breach.

114.    As a direct and proximate result of Defendant negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II — Negligence *Per Se*
**(By Plaintiff on behalf of the Class, or, in the alternative, the Louisiana Subclass)**

115.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

116.    This count is brought on behalf of all Class members.

117.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

118.    The Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105(1)(l), *et seq.*, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service.

119.    In addition to the FTC rules and regulations, and other states regulations where victims of the Data Breach are located require that Defendant protect Private Information from unauthorized access and disclosure, and timely notify the victim of a data breach.

120.    Defendant violated the FTC and state rules and regulations obligating companies to use reasonable measures to protect Private Information by failing to comply with applicable industry standards; and by unduly delaying reasonable notice of the actual breach. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, the foreseeable consequences of a Data Breach and the exposure of Plaintiff's and Class members' sensitive Private Information.

121.    Defendants violations of statutes, rules, and regulations constitutes negligence *per se*.

122.    Plaintiff and the Class are within the category of persons the statutes, rules, and regulations were intended to protect.

123.    The harm that occurred as a result of the Data Breach described herein is the type of harm the statutes, rules, and regulations were intended to guard against.

124.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their Private Information in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

### COUNT III — Bailment
**(By Plaintiff on behalf of the Class, or, in the alternative, the Louisiana Subclass)**

125.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

126.    This count is brought on behalf of all Class members.

127.    Plaintiff's and Class members' Private Information was provided to Defendant.

128.    In delivering their Private Information, Plaintiff and Class members intended and understood that their Private Information would be adequately safeguarded and protected.

129.    Defendant accepted Plaintiff's and Class members' Private Information.

130.    By accepting possession of Plaintiff's and Class members' Private Information, Defendant understood that Plaintiff and the Class expected their Private Information to be adequately safeguarded and protected. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

131.    During the bailment (or deposit), Defendant owed a duty to Plaintiff and the Class to exercise reasonable care, diligence, and prudence in protecting their Private Information.

132.    Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class members' Private Information, resulting in the unlawful and unauthorized access to and misuse of Plaintiff's and Class members' Private Information.

133.    Defendant further breached its duty to safeguard Plaintiff's and Class members' Private Information by failing to timely notify them that their Private Information had been compromised as a result of the Data Breach.

134.    Defendant failed to return, purge, or delete the Private Information belonging to Plaintiff and Class members at the conclusion of the bailment (or deposit) and within the time limits allowed by law.

135.    As a direct and proximate result of Defendant's breach of its duties, Plaintiff and the Class suffered consequential damages that were reasonably foreseeable to Defendant, including but not limited to the damages set forth herein.

136.    As a direct and proximate result of Defendant's breach of its duty, Plaintiff's and Class members Private Information that was entrusted to Defendant during the bailment (or deposit) was damaged and its value diminished.

### COUNT IV — Violation of the Colorado Consumer Protection Act
**Colo. Rev. Stat. § 6-1-105(1)(1) , *et seq.***
**(By Plaintiff on behalf of the Class)**

137.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

138.    The CCPA prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service. . ." *See* Colo Rev. Stat. 6-1-105(1)(1).

139.    Defendant's deceptive acts or practices in the conduct of business include, but are not limited to:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' Private Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which were direct and proximate causes of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' Private Information, including but not limited to duties imposed by the FTC Act, which were direct and proximate causes of the Data Breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' Private Information;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' Private Information;

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' Private Information; and

h.  Failing to promptly and adequately notify Plaintiff and the Class that their Private Information was accessed by unauthorized persons in the Data Breach.

140.    Defendant is engaged in, and its acts and omissions affect, trade and commerce. Defendant's relevant acts, practices and omissions complained of in this action were done in the course of Defendant's business of marketing, offering for sale, and selling goods and services throughout the United States.

141.    Defendant had exclusive knowledge of material information regarding its deficient security policies and practices, and regarding the security of Plaintiff's and Class members' Private Information. This exclusive knowledge includes, but is not limited to, information that Defendant

received through internal and other non-public audits and reviews that concluded that Defendant's security policies were substandard and deficient, and that Plaintiff's and Class members' Private Information and other Defendant data was vulnerable.

142.     Defendant had exclusive knowledge about the extent of the Data Breach, including during the days, weeks, and months following the Data Breach.

143.     Defendant also had exclusive knowledge about the length of time that it maintained individuals' Private Information after they stopped using services that necessitated the transfer of that Private Information to Defendant.

144.     Defendant failed to disclose, and actively concealed, the material information it had regarding its deficient security policies and practices, and regarding the security of the sensitive Private Information. For example, even though Defendant has long known, through internal audits and otherwise, that its security policies and practices were substandard and deficient, and that Plaintiff's and Class members' Private Information was vulnerable as a result, Defendant failed to disclose this information to, and actively concealed this information from, Plaintiff, Class members and the public. Defendant also did not disclose, and actively concealed, information regarding the extensive length of time that it maintains consumers' Private Information and other records. Likewise, during the days and weeks following the Data Breach, Defendant failed to disclose, and actively concealed, information that it had regarding the extent and nature of the Data Breach.

145.     Defendant had a duty to disclose the material information that it had because, *inter alia*, it had exclusive knowledge of the information, it actively concealed the information, and because Defendant was in a fiduciary position by virtue of the fact that Defendant collected and maintained Plaintiff's and Class members' Private Information.

146.    Defendant's representations and omissions were material because they were likely to deceive reasonable individuals about the adequacy of Defendant's data security and its ability to protect the confidentiality of customers' Private Information.

147.    Had Defendant disclosed to Plaintiff and the Class that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business without adopting reasonable data security measures and complying with the law. Instead, Defendant received, maintained, and compiled Plaintiff's and Class members' Private Information without advising that Defendant's data security practices were insufficient to maintain the safety and confidentiality of their Private Information.

148.    Accordingly, Plaintiff and Class members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

149.    Defendant's practices were also contrary to legislatively declared and public policies that seek to protect data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws, such as the CCPA and the FTC Act.

150.    The injuries suffered by Plaintiff and the Class greatly outweigh any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiff and the Class should have reasonably avoided.

151.    The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiff and the Class as a direct result of Defendant's deceptive acts and practices as set forth herein include, without limitation:

      a.    unauthorized charges on their debit and credit card accounts;

      b.    theft of their Private Information;

c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse effects on their credit scores and adverse credit notations;

e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

f.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g.    damages to and diminution in value of their personal information entrusted to Defendant, and with the understanding that Defendant would safeguard their data against theft and not allow access and misuse of their data by others; and

h.    the continued risk to their Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect data in its possession.

152.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their Private Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## COUNT V — Intrusion Upon Seclusion
### (By Plaintiff on behalf of the Class, or, in the alternative, the Louisiana Subclass)

153.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

154.    This count is brought on behalf of all Class members.

155.    Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that Defendant possessed and/or continues to possess.

156.    By failing to keep Plaintiff's and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiff's and Class members' privacy by:

a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

b.    Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

157.    Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider Defendant's actions highly offensive.

158.    Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

159.    As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

160.    In failing to protect Plaintiff's and Class members' Private Information, and in misusing and/or disclosing their Private Information, Defendant has acted with malice and oppression and in conscious disregard of Plaintiff's and the Class members rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of patients. Plaintiff, therefore, seek an award of damages, including punitive damages, on behalf of Plaintiff and the Class.

## COUNT VI — Unjust Enrichment
### (By Plaintiff on behalf of the Class, or, in the alternative, the Louisiana Subclass)

161.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

162.    This count is brought on behalf of all Class members.

163.    Plaintiff and the Class have an interest, both equitable and legal, in their Private Information that was collected and maintained by Defendant.

164.    Defendant was benefitted by the conferral upon it of Plaintiff's and Class members' Private Information and by its ability to retain and use that information. Defendant understood that it was in fact so benefitted.

165.    Defendant also understood and appreciated that Plaintiff's and Class members' Private Information was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

166.    But for Defendant's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and Class members would not have provide or authorized their Private Information to be provided to Defendant, and Defendant would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining patients, gaining the reputational advantages conferred upon it by Plaintiff and Class members, collecting excessive advertising and sales revenues as described herein, monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures, staffing, and expertise raising investment capital as described herein, and realizing excessive profits.

167.    As a result of Defendants wrongful conduct as alleged herein (including, among other things, its deception of Plaintiff, the Class, and the public relating to the nature and scope of

the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the Private Information belonging to Plaintiff and Class members without having adequate data security measures; and its other conduct facilitating the theft of that Private Information) Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

168.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive Private Information, while at the same time failing to maintain that information secure from intrusion.

169.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and the Class in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

170.    The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain the benefit.

171.    Defendant is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the Private Information that was accessed and exfiltrated in the Data Breach and the profits Defendant receives from the use and sale of that information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

A.  That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.  That Plaintiff be granted the declaratory relief sought herein;

C.  That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.  That the Court award Plaintiff and the Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E.  That the Court award Plaintiff and the Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.  That the Court award pre- and post-judgment interest at the maximum legal rate;

H.  That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.  That the Court grant all other relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

Date: October 11, 2023

Respectfully Submitted,

/s/ Nickolas J. Hagman
Daniel O. Herrera
Nickolas J. Hagman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880

Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com

*Attorneys for Plaintiff and the Proposed Class*